Public Employee Labor Relations Board
No. 88-213

APPEAL OF WESTMORELAND SCHOOL BOARD

(New Hampshire Public Employee Labor Relations Board)

August 9, 1989

*Hatfield, Bosse & Moran P.A.*, of Hillsborough (*Thomas T. Barry* on the brief, and *Douglas S. Hatfield, Jr.*, orally), for the Westmoreland School Board.

*James F. Allmendinger*, of Concord, staff attorney, NEA-New Hampshire, by brief and orally, for the Westmoreland Teachers Association.

*Bradley F. Kidder Law Firm,* of Laconia (*Edward E. Lawson* on the brief), by brief for the New Hampshire School Boards Association, as *amicus curiae.*

BATCHELDER, J. This appeal presents issues concerning the arbitrability of a school board's decision not to retain or renominate a probationary teacher for reasons that arguably violate the collective bargaining agreement between the teachers and the school board. The petitioner, the Westmoreland School Board (the board or petitioner), requests this court to overturn a decision of the New Hampshire Public Employee Labor Relations Board (PELRB) ordering the board to process the grievance of Kathleen Hanson, a non-tenured teacher who filed a grievance over the district's decision not to renew her contract for a third year. For the reasons that follow, we reverse.

The facts involved here are not disputed. Kathleen Hanson taught in the Westmoreland School District for two years. In February, 1987, during her second year, the assistant superintendent orally informed her that she would not be rehired for a third year because she was not a "good match" for the job. In April, 1987, the Westmoreland Teachers Association (WTA) and Hanson filed a timely grievance in accordance with the grievance procedures of the collective bargaining agreement (CBA) between the teachers and the board. The CBA does not distinguish between tenured and non-tenured teachers, and the parties do not dispute that the contract covers Hanson. The school board, however, refused to process the grievance, claiming that Hanson's nonrenewal was outside the scope of the CBA's grievance and arbitration provisions.

The board, acting in accordance with our decision in *School District #42 of the City of Nashua v. Murray,* 128 N.H. 417, 514 A.2d 1269 (1986), subsequently filed an unfair labor practice complaint with the PELRB, seeking an order preventing the WTA from pursuing the grievance procedures. The PELRB rejected the board's complaint and ordered the board to follow the CBA's grievance provisions, which ultimately lead to arbitration if a dispute is not resolved. Following the PELRB's denial of its motion for a rehearing, the school board brought this appeal pursuant to RSA chapter 541, and we suspended the PELRB's order pending appeal.

We first address the standards under which we review a PELRB order. This court often has held that the PELRB, as an adjunct to its responsibilities to interpret RSA chapter 273-A, has the implicit authority to decide whether a dispute involves a matter

addressed by a CBA. *School Dist. #42 v. Murray*, 128 N.H. at 421, 514 A.2d at 1272. Although issues of contract interpretation, as a general rule, are matters for this court to decide, *Appeal of Board of Trustees of U.S.N.H.*, 129 N.H. 632, 636, 531 A.2d 315, 317 (1987), we will not overturn the PELRB's decision unless, by a clear preponderance of the evidence, *Appeal of Hooksett School Dist.*, 126 N.H. 202, 204, 489 A.2d 146, 147–48 (1985), it is erroneous as a matter of law, unjust, or unreasonable, *Appeal of University System of N.H.*, 131 N.H. 368, 370, 553 A.2d 770, 772 (1988). Our standard of review of PELRB decisions is a narrow one, *Appeal of Town of Pelham*, 124 N.H. 131, 134, 469 A.2d 1295, 1297 (1983), and the PELRB's findings upon questions of fact are deemed *prima facie* lawful and reasonable, *Appeal of City of Concord*, 123 N.H. 256, 257, 459 A.2d 285, 286 (1983).

In their briefs, both parties agree that arbitration should be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 582–83 (1960). This court has not specifically adopted this standard in reviewing PELRB orders to arbitrate, but the WTA's attorney suggested at oral argument that we do so. In *Warrior & Gulf*, the rationale for applying such a rule was the federal policy of promoting industrial peace through collective bargaining, a major component of which is the inclusion of an arbitration clause in a CBA. 363 U.S. at 578.

For purposes of deciding whether a dispute is arbitrable, the positive assurance standard is only one of several principles to be gleaned from the *Steelworkers Trilogy*, of which *Warrior & Gulf* is an important part. *See Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960). As described more recently by the United States Supreme Court in *AT&T Technologies v. Communications Workers*, 475 U.S. 643 (1986), some of these principles are that: (1) "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," quoting *Warrior & Gulf*, 363 U.S. at 582; (2) unless the parties clearly state otherwise, "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator;" (3) a court should not rule on the merits of the parties underlying claims when deciding whether they agreed to arbitrate; and (4) under the "positive assurance" standard, when a CBA contains an arbitration clause, a presumption of arbitrability exists, and "[i]n the absence of any express provision excluding a particular

grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail," quoting *Warrior & Gulf*, 363 U.S. at 584–85. *AT&T Technologies*, 475 U.S. at 647–50.

In our State, many of the same policy concerns which prompted the United States Supreme Court to adopt these standards weigh in favor of our adopting the same standards under our own laws. In fact, the first two provisions comport with existing law in our State. *See School Dist. #42 v. Murray*, 128 N.H. at 420, 514 A.2d at 1272 (CBA determines the extent of the agreement to arbitrate); *Appeal of Board of Trustees*, 129 N.H. at 636, 531 A.2d at 317 (contract interpretation generally is a matter for this court). The third and fourth principles described in *AT&T Technologies*, 475 U.S. at 649–50, stem from the policies supporting the inclusion of arbitration clauses in labor contracts, policies present in our collective bargaining law. In enacting RSA chapter 273-A, the legislature stated that the policy of the State was "to foster harmonious and cooperative relations between public employers and employees." Laws 1975, 490:1. To further this policy, when "a dispute arises as to the interpretation or application of the agreement, there must be a mechanism for resolving the dispute or else the agreement is meaningless." *Appeal of Town of Pelham*, 124 N.H. at 136, 469 A.2d at 1298. Because broadly similar policies—promoting management-labor harmony through the inclusion of alternative dispute resolution provisions—support both federal and State labor laws, we adopt the principles outlined in *AT&T Technologies supra* for reviewing the scope of arbitration provisions in labor contracts. Viewed under these standards, we now turn to the specifics of this case to see whether we may determine with positive assurance that the CBA is not susceptible of an interpretation that covers the dispute.

We examine first the relevant language of the CBA. *Appeal of Board of Trustees of U.S.N.H.*, 129 N.H. at 635, 531 A.2d at 317. In Article 1, section 1.2, the Westmoreland School Board recognizes the Westmoreland Teachers Association as the exclusive representative of all teachers in the Westmoreland School District. Article 2, section 2.1 describes management's rights. It states that "[t]he parties understand that the Board and the Superintendent may not lawfully delegate powers, discretions and authorities which by law are vested in them, and this Agreement shall not be construed so as to limit or impair their respective statutory powers, discretions and authorities." Article 9 sets forth the CBA's grievance procedure. A grievance is "a claim based upon an alleged violation

of or variation of or from the provisions of this contract or the interpretation or application thereof." Section 9.1. Grievances which are not resolved informally or in one of three levels may be referred to binding arbitration. Section 9.8. The arbitrator "shall have no power or authority to do other than interpret this agreement." The last pertinent provision of the CBA is Article 16, concerning discipline. It provides that "[w]henever an employee violates any of the Board's regulations, he may be subject to official disciplinary action up to and including discharge. An employee shall not be disciplined except for just cause[,]" which means that "the evidence supports the disciplinary action." Section 16.1.

The heart of the dispute between the parties is whether the school board is required to process a grievance concerning the nonrenewal of a probationary teacher's contract, which the WTA alleges constitutes a discharge under Article 16 requiring just cause. In its order, the PELRB set forth the arguments of the parties and concluded by finding that: (1) the evidence did not indicate that Kathleen Hanson's nonrenewal was disciplinary in nature; (2) the parties agreed that the disposition of the nonrenewal issue fell under RSA 189:14-a; and (3) the issue before it was whether the school board had processed Hanson's grievance according to CBA provisions. The PELRB then ordered the board to process Hanson's grievance.

The parties' respective arguments before the PELRB and here on appeal are essentially the same. The school board makes three principal arguments to this court. Relying on cases outside of this jurisdiction, the school board first contends that public policy prevents it from delegating to an arbitrator its discretionary authority over teacher employment. Second, it claims that Hanson's nonrenewal did not constitute discipline and discharge in violation of Article 16, and that nonrenewals are not grievable under the contract. Finally, the board alleges that the PELRB's decision is inconsistent on its face and therefore not enforceable.

The overarching issue in the present case is whether the parties actually have negotiated to arbitrate, *see Brown v. Bedford School Board*, 122 N.H. 627, 629, 448 A.2d 1375, 1377–78 (1982) (collective bargaining gives public employees the opportunity to bargain for rights not granted by law), not whether they have the authority to do so, *cf. Appeal of Town of Pelham*, 124 N.H. 131, 137, 469 A.2d 1295, 1298 (1983) (town lawfully could agree to refer hiring and firing disputes to CBA's grievance process); *Appeal of Watson*, 122 N.H. 664, 666–67, 448 A.2d 417, 419 (1982) (bargaining over manner of termination of probationary teachers not precluded by

managerial policy exception to bargaining law). As the board's second argument specifically addresses this issue, we will direct our discussion to it first. The board contends that the term discipline, as used in CBA Article 16, refers only to those situations where a teacher has violated one of its rules or regulations and that, because the board never contended that Hanson had violated a rule or regulation, she was not entitled to the procedural protection of discharge only for just cause. The board contends, rather, that Hanson's nonrenewal was outside the scope of the CBA and covered only by RSA 189:14-a (Supp. 1988). That statute requires school districts to provide written notice on or before March 31 to teachers who have taught in that district for one or more years that they will not be renominated or reelected. *Id.*, :14-a, I(a) (Supp. 1988). Teachers who have taught in the same school district for three years or more must receive notice by the same date and may request a hearing on the reasons why the district decided not to renominate or reelect them. *Id.*, :14-a, I(b) (Supp. 1988); *see also Littky v. Winchester School Dist.*, 129 N.H. 626, 628–29, 529 A.2d 399, 401 (1987). The board maintains that it reserved its authority under the management rights clause of the CBA to decide without challenge whether to renew a non-tenured teacher's contract. The board claims it satisfied the statute and its contractual obligations by giving Hanson timely notice that her contract would not be renewed.

In contrast, the WTA focuses not on the word discipline, but on the word discharge. It contends that Article 16 governs discharges, and that the term discharge is broad enough to include nonrenewals. The WTA reasons that because Black's Law Dictionary (5th ed. 1979) defines discharge as termination, *id.* at 416, and this court has treated a nonrenewal as a termination, *see Appeal of Watson*, 122 N.H. at 667, 448 A.2d at 419, the term discharge encompasses the nonrenewals involved here. Article 16 therefore requires the board to have just cause before deciding not to renominate Hanson. The WTA further reasons that since all disciplinary complaints are subject to the grievance procedure, a discharge (*i.e.*, non-renomination) is as well. Based on these arguments, the WTA asserts that it has raised a question of contract interpretation which, under Article 9, is sufficient to send the matter through the grievance procedure. As further support for its ultimate position, the WTA cites the legislative history of RSA chapter 273-A, the policy behind the statute, and prior case law to demonstrate that arbitration of contract disputes is favored under the bargaining law, notwithstanding claims of managerial right.

We disagree with the WTA's reading of the CBA and hold that it is not susceptible of a reading which covers this dispute. The term discharge in Article 16 is clearly used in connection with disciplinary action taken for violation of the board's regulations. The CBA provision states that "[a]n employee shall not be *disciplined* except for just cause." (Emphasis added.) Although we agree with the WTA that, as a general proposition, the term discharge may be broad enough to encompass non-renominations, in the context of this CBA the article does not use the word discharge in such a broad manner. Rather, the article refers to discharge only in the context of a violation of board rules. Viewed in this light, we can state with positive assurance that the CBA is not susceptible of a reading which would cover the asserted dispute.

We note that the WTA correctly argues that the function of the PELRB, and of this court, is simply to determine whether or not it has raised a colorable issue of contract interpretation, without deciding it on the merits. The real issue here, however, is whether the contracting parties have agreed to arbitrate a particular dispute. As we have stated before, "the extent of an arbitrator's jurisdiction depends upon the extent of the parties' agreement to arbitrate." *School Dist. #42 v. Murray*, 128 N.H. at 420, 514 A.2d at 1272. Although we recognize that only the most forceful evidence will prevent a grievance from going to arbitration where no express CBA provision precludes such action, *AT&T Technologies*, 475 U.S. at 650, the WTA takes the contractual language of the CBA provision it relies on too far out of context for us to conclude that the parties intended to arbitrate this dispute.

Having decided the previous issue as we have, we need not address the other arguments the board sets forth.

*Reversed.*

All concurred.